OUTLOOK ENVELOPE CO. v. SAMUEL CUPPLES ENVELOPE CO.

(Circuit Court of Appeals, Second Circuit. March 9, 1915.)

No. 23.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—MACHINE FOR MAKING OUTLOOK ENVELOPES.

The Slater patent, No. 893,105, for a machine for making what are known as outlook or window envelopes, consisting essentially of mechanism which, during the period intervening between the operations of gumming an envelope blank and folding the flaps of such blank as performed on an envelope machine of the known type, automatically and mechan-

─────────────

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ically gums the edge of the window opening cut in the blank and accurately applies the transparent patch over the same. was not anticipated, and discloses patentable invention. The machine, by greatly increasing the speed of making such envelopes over the hand process previously employed, thereby cheapening the product, practically created a new industry, and the patent is of a primary character and entitled to a liberal construction. Claims 5 and 15 also *held* infringed.

2. WORDS AND PHRASES—"WINDOW ENVELOPE."

A "window envelope" is one which has on its face a patch of transparent paper forming a window through which an address written upon an inclosure can be seen.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here on appeal from a decree entered on December 3, 1913, in the District Court of the United States for the Southern District of New York dismissing the bill of complaint in a suit brought by complainant against defendant for infringement of claims 5 and 15 of letters patent No. 893,105, granted July 14, 1908, to William D. Slater, on a machine for making what are known as outlook or window envelopes.

The Outlook Envelope Company is a corporation duly created and existing under the laws of the state of West Virginia and has its principal place of business in the city of Chicago, county of Cook, and state of Illinois.

The Samuel Cupples Envelope Company is a corporation duly created and existing under the laws of the state of Missouri and has its principal place of business in the city, county, and state of New York, borough of Manhattan.

William D. Slater, a citizen of the United States residing at Springfield, Mass., having made application for the patent in suit for an envelope machine, which application was filed in the Patent Office of the United States on July 6, 1903, assigned all his right, title, and interest in the invention and in all letters patent to be obtained thereon to the United States Envelope Company, a corporation organized and existing under the laws of the state of Maine. The instrument of assignment duly requested the Commissioner of Patents to issue all letters patent of said invention and application for patent to the United States Envelope Company. The assignment was duly recorded in the United States Patent Office. Thereafter, the patent having been issued to the United States Envelope Company, that corporation on March 13, 1909, sold and assigned the same to the Outlook Envelope Company, transferring to it the full and exclusive right, title, and interest in the invention and the letters patent to the full end of the term for which they were granted. The United States Envelope Company also sold and assigned to the complainant all claims to back damages, profits, or recoveries that it had against any person, firm, or corporation, who had infringed the patent while it held title thereto.

The bill of complaint charges the defendant with having made, used, and sold envelope machines which contained the invention covered and secured by complainant's patent, and asks for an injunction, an accounting, and damages.

F. P. Fish, Louis W. Southgate, and O. Ellery Edwards, Jr., all of New York City, for appellant.

Knight Bros., of New York City (Wm. Houston Kenyon and Harry E. Knight, both of New York City, of counsel), for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The patent in suit, it is claimed, shows and describes the first automatic machine for making "Outlook" or "Window" envelopes.

[2] A window envelope is one which has on its face a patch of transparent paper forming a window through which an address written or printed upon an inclosure can be seen. The use of the window does away with the necessity of addressing the envelope and also all liability of an erroneous address being given to the envelope or one different from that given upon the inclosure, as the same address serves as the address of the inclosure and the address of the envelope.

It appears that in September, 1862, one J. S. Brown, of Washington, D. C., took out the first patent, No. 36,393, on widow envelopes. His invention consisted of two parts. One part consisted of separate, transferrable cards of address, which contained the name of the person or party addressed, and his place of business. The other part of his invention consisted in making the envelope sufficiently transparent to clearly show the cards of address through its face. This was to be accomplished either by rendering a portion of the envelope itself transparent and the remainder of the envelope opaque or by cutting out a piece of the envelope of the proper size and shape and covering the aperture with transparent paper or other equivalent transparent covering. His invention was not for a machine by which the envelope was to be made, but it was for a "method of directing letters, papers, and packages." It showed a clear conception of the advantages of the window envelope, and those advantages were fully set forth in the specification.

"The cost of manufacturing the improved envelopes," he said, "will scarcely, if any, exceed that of ordinary envelopes now in use. For while the additional cost of rendering the envelopes and wrappers transparent will be but little, a cheaper quality of paper may be employed, not requiring to be finished so highly as for receiving the pen. The cards of address also will cost only a mere trifle." His invention, however, apparently did not commend itself as it never got into general use and the patent itself long since expired.

In 1901 Americus F. Callahan, of Chicago, Ill., filed an application for a patent in which he alleged that he had invented a certain new and useful improvement in envelopes by a device adapted to securely inclose and seal the contents of the envelope while revealing so much of the inclosure as would enable the observer to ascertain the destination of the same. In his specification he stated his claim as follows:

"In combination with an envelope having a comparatively opaque face and a display-opening therein having transparent covering, of a folded communication sheet therein, said sheet being so folded, with regard to the position of the sendee's name and address upon the same side of the sheet with the communication, that only said name and address appear through the display-opening whereby the sendee's name and address as a part of the communication serves also as the envelope address."

A patent was granted him, No. 701,839, on June 10, 1902. This patent was held void in the First Circuit in the suit of Outlook Envelope Co. v. Sherman Envelope Co. (D. C.) 210 Fed. 630, affirmed in 216 Fed. 754, 132 C. C. A. 575 (1914). All that was accomplished by the Callahan patent was to provide a transparent cover for the open slot envelope when used in combination with a communication sheet addressed and folded in the manner stated in his claim. His patent was

held void for lack of invention, in view of the state of the art. Callahan brought his window envelope to the attention of the United States Envelope Company, and that company manufactured them by hand and put them on the market, and they were received with some favor. But the necessity of making them by hand made their cost relatively large and precluded their very general use. If the matter was to obtain commercial success it was necessary that a machine should be devised which should dispense with the hand labor involved in their production. The window envelopes made at that time by the United States Envelope Company were made in the following manner: The blanks were first cut and then the hole or opening was cut. Then the blanks were taken to a machine which gummed around the opening. Adjacent to this machine was a large table around which were seated eight girls. As the blanks came from the machine, they were taken by one of these girls and distributed to the other seven girls, each girl taking a blank and placing a patch upon the fresh gum, smoothing it down by hand. The blanks were then stored in piles and subsequently taken to an ordinary folding machine, which gummed the seal and back flaps. The blank was then folded in the ordinary manner. The gum, having been applied to the blanks and allowed to dry, made the blanks curl and crown up in the center, so that it was difficult for the folding machine to handle them. Because of this there was a very considerable waste, which was found to run from 10 per cent. to 20 per cent. The curling of the blanks made necessary the attention of "a fixer" to operate the folding machine. The cost of all this extra work involved in applying the patches amounted to 90 cents per 1,000, and was regarded as prohibitive of the envelopes ever coming into general use. While the envelopes were regarded by many as very desirable and as better than ordinary envelopes, they were not so much more desirable than envelopes of the ordinary kind as to make them salable in large numbers at the enhanced cost. Envelopes made by hand labor cannot successfully compete in the general market with those manufactured by machinery. For successful machines existed for the manufacture of the ordinary envelope, but no machine existed which was capable of producing a window envelope.

Mr. Slater was employed by the United States Envelope Company, and his attention was called to the difficulty which was experienced in the manufacture of the window envelopes. He conceived the idea of so organizing and adding to the mechanism of the ordinary envelope folding machine that the machine should not only gum around the edge of the window and apply the blanks automatically without interrupting the ordinary operation of the machine, but that it should accomplish this result at the high speed required for commercial production. His device provided a machine having additional gumming mechanism, correlated with the existing gummers, to apply the gum around the edge of the window, and also having a practical and efficient mechanism for handling and applying at high speed the small and extremely thin pieces of transparent paper with great accuracy at the right place over the gummed window edge.

A standard window envelope, as made on a Slater machine, has an opening with parallel sides and rounded ends cut in the face side, about

5 inches long and 1¼ inches wide, running parallel with the length of the envelope and near its lower edge. This opening is closed by a patch of thin transparent paper, known as glacene paper. The patch is about 5⅝ inches in length and is 1⅞ inches in width, giving an overlap of five-sixteenths of an inch. The width of the opening is large enough to disclose the address and the address only on the inclosure.

In devising a machine which would produce such an envelope, Mr. Slater solved the following problems: (1) That of gumming by mechanical means around the opening of a window envelope for the reception of a covering patch without interrupting the operation and required speed of an envelope making machine. (2) That of applying in an organized automatic machine a patch of light flimsy paper, more than five inches in length and nearly two inches in width, to cover the opening and its gummed margin with accuracy and speed. He thereby avoided the great inherent difficulty of the previously known hand method in that the curling and distortion of the freshly pasted blanks, which was fatal to the hand operation, was made impossible.

We are satisfied that the Slater machine practically created a new industry. The court below thought differently, but in this respect we think it was mistaken. Window envelopes were unable to compete successfully with ordinary envelopes so long as the former were made by hand and the latter by machinery. The capacity of a Slater machine is 40,000 envelopes a day of 10 hours. Prior to the invention of the Slater machine, and when the gumming machine and the girls were employed in their production, the output only amounted to about 10,000 a day. With the adoption of the Slater machine the use of window envelopes enormously increased. At the time the proofs were taken, complainant had 15 of the machines in operation, giving a daily output of 600,000 of window envelopes. The theory of defendant is that the use of such envelopes increased first, and therefore the new machinery was devised. The testimony, on the contrary, indicates to us that the use of these envelopes remained small until the handicap of the heavy cost of manufacture was removed by the invention of the Slater machine. Then there followed the enormous increase in the demand for envelopes of this character.

The specification of the patent in suit describes the generic nature of the invention as follows:

"My present invention relates to a machine for manufacturing what are known to the trade as 'outlook envelopes,' or envelopes having an opaque body with a transparent section or panel at that part of the envelope commonly occupied by the address. Envelopes of this character are designed to be used with inclosures having the address suitably placed thereon to register with the transparent section of the envelope and form the address of the envelope. Such envelopes are manufactured by pasting a patch of transparent paper over an opening formed in proper position in the envelope blank.

"The entire operation of applying the transparent patch to the body of the envelope has heretofore been done by hand, and it is the object of my present invention to provide mechanism for the application of the transparent patch to the body of the envelope by which the operation can be automatically and rapidly performed by mechanical means, and to arrange that the transparent patch shall be applied to the envelope blank during the period intervening between the operations of gumming an envelope blank and folding the flaps of said blank as performed upon an envelope machine of the known type.

"The mechanism embodying my present invention is designed to operate upon an envelope blank having an elongated piece cut from the body of the envelope at that part usually occupied by the address, and thereby forming an opening in the envelope, and my invention comprises means for applying adhesive material to the body of the envelope blank around the elongated opening; means for feeding the gummed envelope blank forward over a pressing table; means for registering the gummed envelope blank on the pressing table; means for applying an elongated transparent patch to the body of the envelope blank slightly larger than the opening, so that the edge of the patch will overlap the gummed margin around the opening; means for applying pressure to the transparent patch to secure its firm adhesion to the body of the envelope blank; and means for removing the patched blank from the pressing table.

"The combination of instrumentalities for accomplishing the above-mentioned operations automatically and by mechanical means in the order named, the combination of the above instrumentalities with an envelope machine for manufacturing a completed envelope, and such arrangement of parts of an envelope machine as may be necessary to apply a patch to an envelope blank between the operation of gumming an envelope blank and folding the flaps of said blank, form the subject of my present invention."

In the specification Slater also declares:

"So far as I am aware, it is broadly new to apply a patch to the opening in an envelope blank by mechanical means, and to combine a patch applying mechanism with an envelope machine, so as to affix the patch to the envelope blank between the operations of gumming the blank and of folding the flaps of the envelope, and I do not wish to confine myself to the above specific construction and arrangement of the mechanism for applying a patch to an envelope blank and for pressing their overlapping surfaces together, as modifications in the various details of construction and arrangement may be made without departing from the scope of my present invention."

The claims in issue are 5 and 15, and they read as follows:

"(5) In the envelope machine, the combination with mechanism for gumming an envelope blank around an opening therein, mechanism for folding the blank and means for feeding the blank from the gumming to the folding mechanisms with an intervening dwell of the blank, of mechanisms for applying a patch to the blank covering the opening therein."

"(15) The combination with mechanism for gumming an envelope blank around an opening therein, mechanism for folding the flaps of said blank and means for feeding the blank from the gumming mechanism to the flap folding mechanism, of mechanism interposed between the gumming mechanism and flap folding mechanisms for applying a patch to the blank to cover the opening therein."

The court below thought it clear that Slater accomplished just one thing, namely:

"The applying of the patch between the operations of gumming the blank and the folding of the flaps of the envelope so that the blank has no opportunity to curl."

And claims 5 and 15 have been vigorously assailed by the defense upon the ground that no invention was involved in view of the prior art.

In his specification Mr. Slater declared that, so far as he was aware, it was broadly new to apply a patch to the opening in an envelope blank by mechanical means and to combine a patch applying mechanism with an envelope machine, so as to affix the patch to the envelope blank between the operations of gumming the blank and of folding the flaps of the envelope. But as his claims are assailed upon the ground

that, in view of the prior state of the art, what he did involved no invention, it is necessary to consider the subject of anticipation. In this connection the court below found it necessary to consider only two patents and an experimental machine. And to these we shall confine our attention.

The two patents to be considered are for machines for manufacturing what are known as "tearing envelopes." A tearing envelope was described by complainant's counsel as "one having a wire or string or strip of fabric incorporated therein at one edge between a flap and the body portion of the envelope so that the envelope can be slit along one edge by pulling on the wire, string, or strip."

· The Tyrrel patent is No. 436,618 and was issued on September 16, 1890, to Alvin D. Tyrrel, of South Hadley Falls, in the state of Massachusetts. In his specification Tyrrel said:

"This invention for improvement in envelope machines particularly appertains to mechanism for affixing to the inner face of the seal-flap at or near and along the line of fold for said flap and at the junction thereof with the part of the blank forming the front of the envelope a strip of cord or tape. This strip of narrow tape or cord projects slightly beyond the sealing-flap at its one end, the purpose thereof being to afford means for conveniently opening the envelope after the same has been sealed by drawing on the said protruding end of the tape in a direction transversely of the line of fold of the seal-flap; the said tape constituting a severing device for that envelope to which it is attached as a part thereof."

The gumming mechanism of the Tyrrel patent is different from the gumming mechanism of the Slater patent. In the Tyrrel patent associated with the flap gummer is a narrow gummer so disposed as to extend over the blanks from end to end thereof at a portion at or near and along the folding-line for the blank. This puts a line of gum on the flap of the envelope entirely outside of the body portion of the envelope blank. The gummed blank is fed along so as to come under the reciprocating creasing plunger. The creasing or folding plunger is reciprocated to force the blank down through a rectangular opening in the frame, which operation creases the flaps of the blank at right angles to the body portion.

At the side of the plunger is arranged a tape-carrying box reciprocating, in which is a plunger. The operation of these parts is such that, when the envelope blank is in its position under the folder plunger, the box moves down to the blank, and the plunger is independently reciprocated to apply a tape or cord to the line of gum on the flap of the blank. Then, when the envelope blank is folded, the cord or strip is attached to the inside of the seal flap at the edge of the envelope. There is certainly nothing in this mechanism which can be used in place of or which corresponds in function to the mechanism which the Slater patent provides between the gumming and folding mechanism for applying a patch to the blank covering the opening in the envelope. The box or holder block in the Tyrrel patent is placed outside of the plunger and must be arranged at that place in order to bring the tape or cord at the crease-line of the envelope. This makes impossible any application of the tape or cord to the body portion of the envelope, which is defined by the outline of the plunger.

Moreover, the mechanism of the receptacle with its vertical kerf or

deep channel "preferably open from end to end of said tape holder block" is such that it would be of no use for supporting and attaching a thin, wide, flimsy patch over a window. To do this satisfactorily requires a greater accuracy than the Tyrrel mechanism admits of, capable though it is of holding cords and tapes accurately enough for application to the flap of an envelope at its crease-line. In the latter case no great accuracy is required, and in the other case the greatest accuracy is essential.

We are satisfied that the Tyrrel patent does not show either the organization or the elements of Slater's combinations of the claims in suit. The law of the organization of the Tyrrel machine is inconsistent with that of the Slater machine. We do not see how it would be possible to rebuild the machine of the Tyrrel patent so as to use it in manufacturing window envelopes without departing absolutely from its fundamental characteristics. That machine does not comprehend the idea of the Slater patent, the idea of an annular gummer, capable of laying an even band of gum around an opening in the blank for a window envelope, and it affords no device for holding and manipulating a patch for the window in the envelope. In the Tyrrel machine the only way the tapes or cords are held in place in the kerf is by the friction on the sides of the receptacle. But the friction this affords clearly would not suffice to hold thin, wide patches in place, and there is nothing corresponding to the supporting toes of either Slater's or the defendant's machine. And, as we have already noted, the Tyrrel machine is absolutely incapable of applying any material, either thin paper, tape, or cord, to the body portion of an envelope blank.

We pass on to the consideration of the Timmis patent.

Prior to the invention of Timmis, the tearing envelopes were made by the use of threads and wires in the envelopes by which the tearing was done. But there were certain objections to the use of wire or cords, and it occurred to Timmis to obviate them by substituting a strip of fabric. Attempts had been previously made to substitute a narrow tape, but the difficulties in feeding a narrow tape to the machine' were found to be so great that the matter was abandoned. Timmis sought to overcome these by feeding the tearing material into the machine from a roll whose width was equal to the length of the strip. The amount of the feed from the roll of tearing fabric at each cycle of operation of the machine was equal to the width of the tearing strip.

The Timmis patent is No. 679,921 and was issued on August 6, 1901, to Walter S. Timmis, of the city of New York, borough of Brooklyn. In his specification Timmis said:

"My invention relates to machines for manufacturing envelopes, and more particularly to machines for completing the envelopes after blanks for the same have been cut into proper form and comprises, with other features, means for cutting from a roll of suitable fabric a strip of proper length and for attaching the same to the envelope-blank adjacent to one of the folding-lines thereof, whereby, when the blank is folded over along such folding-line, the inclosed strip, together with the portions of the blank covering the same, will form a bulky portion, which may be readily taken hold of and torn off for the purpose of opening the envelope without tearing the other portions of the same, all as hereinafter more particularly set forth. The use of a flat

strip I consider preferable to the use of a thread or cord on account of the great difficulty experienced in attaching the latter; it having been found impracticable to draw the thread or cord over and affix it in a sufficiently reliable and permanent manner to make it useful as an opener."

He also states:

"In carrying out my invention I use, in combination with the means hereinafter described, which constitute the invention, gumming, picking and folding devices of a general character, such as are well known in the art."

And again he states:

"In carrying out my invention I provide mechanism, as hereinafter more particularly described, for intercepting the blank in its travel from the picker to the folding device and for placing it underneath a mechanism which cuts a strip from a larger piece or sheet of fabric and immediately afterward pastes said strip along one of the folding lines of the envelope. The strip of gum for thus securing said strip has preferably been previously applied to the blank by the picker, but it may instead be applied to the strip itself immediately before cutting it off, as exemplified in some of the accompanying illustrations of my improved appliances. After this operation the blank is shifted to the folding apparatus, and the envelope is completed there in the usual manner."

The claims of the Timmis patent recite the successive steps of gumming the blank, cutting off the strip, applying the strip to the blank by pressure, and folding the blank. Mr. Timmis testified as to the working of his machine as follows:

"The operation of the machine as built was as follows: The blanks were piled at the front of the machine on the elevator table, as is usual in machines of this general character, the top blank of the pile being separated from the pile by means of the usual picker, the gumming device which placed gum on the blank both for the sealing flap and the back and side flaps, but in addition thereto there was another picker, which deposited a strip of gum on the blank for the purpose of receiving the strip of fabric. After the blank is stripped from the picker devices, it falls upon the conveyor, which conveys it to the central station, at which point it is adjusted in correct position by means of the adjustable stops, previously referred to. While the blank was being conveyed to the central station, the feeding rollers of the strip attachment operated upon the fabric and fed forward a portion of the fabric through the upper and lower guide previously referred to. After the blank has reached the central station, the upper part of the guide is forced down by means of spring seated pressure on top of the fabric, and thereby clamped to the lower part of the guide, after which both the upper and lower part of the guide move down together, carrying the fabric within one-sixteenth of an inch of the blank. The knife and plunger follow the guide, cut off the strip, and attach it to the blank, the guide raises, after which the plunger raises. The strip, now being attached to the blank in proper position, is conveyed to the folding box, the plunger descends, and the various flaps of the envelope are folded over and dropped into the delivery chain in the usual manner. The slack provider, previously referred to, consisted of a horizontal bar mounted on the plate, which carries the lower guide. The fabric being made to pass under this horizontal bar and over another horizontal bar placed close to the first-named bar but in a higher plane. The fabric being held taut by the clamps and feeding rollers at the one end and the roll of fabric being free to rotate upon its own axis, the action of the first-named horizontal bar upon the downward movement of that bar was such that the roll was rotated a sufficient amount to provide a slack in that part of the fabric between the feeding rolls and the roll of the fabric, so that on the return of the upper' and lower guides, and upon the separation of these guides, the feeding rolls were free to feed a portion of the fabric between these guides without having to pull the roll of fabric or overcome its inertia. The guides and the plunger

knife were both operated by means of cams; there being one cam for each. Both the plunger and knife combination and the guides were connected to the cam mechanism by means of a lever fulcrumed between the cam shaft and the plunger and guide mechanism. This fulcrum was common to the two mechanisms and was mounted upon a plate, which plate was arranged to move up and down so that, when the fulcrum was in the upper position, neither the plunger knife nor the guide would come down to the presser table, but, when the fulcrum was in the lower position, both the plunger and guide were set in operative position. This moving of the fulcrum was performed by means of a toggle arrangement and connected to the front of the machine by means of a rod, upon which there was also mounted a device for throwing out of operative connection the feeding pawl which turned the feed rolls. The whole purpose of this fulcrum moving device and throw-out feed mechanism being for the purpose of convenience in the operation of the machine, so that every function of making the envelope outside of the strip-attaching mechanism could be tested out before the strip-attaching mechanism was put in operation."

A machine under this patent was constructed in the latter part of the year 1901, although the strip-attaching mechanism was organized somewhat differently from that stated in the patent. The machine was not a commercial success, although several thousand envelopes were made on it. A corporation organized to exploit it found it impossible to interest capital in the enterprise, and the machine was put in storage.

Now it must be said of the Timmis patent, as we said of the Tyrrel patent, that it does not relate to a machine for making window envelopes, and that the machine of this patent is as incapable of making window envelopes as the Slater machine is incapable of making tearing envelopes. The machines turn out different products.

Timmis applies a strip of gum along and near one edge of the envelope. Slater on the other hand applies a band of gum around an outlook opening in the face of the envelope. The strip-applying mechanism of Timmis is so organized that it cuts off a very narrow strip of a stout textile material and applies that along one edge of the envelope. But the Slater machine applies a broad transparent patch of thin, fragile paper over the outlook in the body of the envelope.

We shall not consider the mechanism of the Timmis patent in detail. Its mechanism is so far removed from the mechanism of the Slater machine as to make it unnecessary to do more than state in a general way certain conclusions which we have reached concerning it: (1) There is nothing in it which comprehends the idea of an annular gummer or of the idea of using such a gummer to lay an absolutely even band of gum around an opening in the blank for a window envelope. (2) The feed rolls which snap the edge of a piece of fabric under the reciprocating knife and plunger cannot manipulate or handle a patch for a window envelope. (3) The tearing fabric in all the modifications shown in the patent is applied to one of the flaps of an envelope and not to the body portion. (4) There is no device for holding and controlling a patch of paper and applying it accurately to the surface of an envelope blank.

It would be impossible in the Timmis patent, as we stated it to be in the Tyrrel patent, to so reconstruct the machine by reportioning the parts as to fit it to make window envelopes. We do not think that

a skilled mechanic could take either the Tyrrel or the Timmis machine and, without the aid of the disclosure made by Slater, construct out of either of them a machine which would successfully make window envelopes.

In 1910 Mr. Timmis, having before him the Slater patent, secured possession of the Timmis machine of 1901, took it from storage, and constructed what in this record is called "the Timmis Demonstrative Model." The purpose of this was to show that the Timmis machine could be organized to make window envelopes. The newly constructed machine, for numerous changes were made in it, no less than eight new parts being added, was constructed for the purposes of this case. And counsel for the defendant claim that this reconstructed machine can make a window envelope. In reply to the assertion that the Timmis machine cannot make a window envelope, the defendant's counsel say:

"This is true if by a window envelope is meant only the particular embodiment of window envelope shown in the Slater patent."

And he asks:

"Assuming, while not admitting, that the Slater machine makes window envelopes through which an address can be viewed, and the Timmis machine makes envelopes in which the window, if one were cut, would be too small to permit the inspection of the address, can it be said that the machine itself is necessarily a different mechanism from the machine which makes the other?"

Now we have already stated our opinion concerning the machine made in 1901 under the Timmis patent, and we do not find occasion to modify that opinion by virtue of the changes in the mechanism introduced in the reconstructed machine of 1910. We do not regard that machine as of serious probative force. And we call attention to the statement made by Mr. Justice Blatchford writing the opinion of the Supreme Court of the United States in Consolidated Safety Valve Co. v. Crosby Steam Gauge & Valve Co., 113 U S. 157, 170, 171, 5 Sup. Ct. 513, 521 (28 L. Ed. 939) (1885):

"In regard to all of the above patents, adduced against Richardson's patent of 1866, it may be generally said that they never were, in their day, and before the date of that patent, or of Richardson's patent, known or recognized as producing any such result as his apparatus of that patent produces, as above defined. Likenesses in them, in physical structure, to the apparatus of Richardson, in important particulars, may be pointed out, but it is only as the anatomy of a corpse resembles that of the living being. The prior structures never effected the kind of result attained by Richardson's apparatus, because they lacked the thing which gave success. They did not have the retarding stricture which gave the lifting opportunity to the huddled steam, combined with the quick falling of the valve after relief had come. Taught by Richardson, and by the use of his apparatus, it is not difficult for skilled mechanics to take the prior structures and so arrange and use them as to produce more or less of the beneficial results first made known by Richardson; but prior to 1866, though these old patents and their descriptions were accessible, no valve was made producing any such results."

We do not discover in the prior art, as that art is disclosed in the record before us, anything which invalidates the patent in suit.

The defendant introduced upon the market in 1904 a type of envelope which is termed the "Self-addressed." This envelope was in

substance the Callahan envelope of patent No. 701,839. At the time this envelope was introduced upon the market, and for some time thereafter, the transparent patch was applied by hand. Defendant interested its shop superintendent, one Thomas W. Kienast, in an endeavor to construct a machine to apply the patch. Kienast got up a paper cutting and patch applying device and attached it to the original Timmis machine of 1901, and which had been in storage since 1904. Removing the Timmis cutting and applying attachment of 1901, he attached his device in the same location between the gummer and the folder where the Timmis cutting and applying device had been attached. The improvements made by Kienast were solely in the matter of cutting and applying the patch, and no new construction or principle of operation in the matter of gumming or of feeding or of folding the blank was involved. He applied for a patent on these improvements limiting his claims to the mechanism for cutting and applying the patch, including the receiving table for supporting the blank in the period of dwell. His application was held up for a year and four months, but on April 7, 1908, a patent, No. 884,335 was issued to him. In his specification Kienast stated that his invention related to "an improvement in machines for making envelopes having incorporated therein a transparent paper strip through which writing upon an inclosure placed within the envelope may be viewed, thereby making the envelope one commonly termed a 'self-addressed envelope,'" he continued:

"The present invention pertains to mechanism whereby the transparent paper web is fed, cut into strips of the desired size, and applied to the envelope blanks that are provided with eight openings at the points to which the transparent paper strips are to be applied."

But the fact that defendant is acting under a patent cannot excuse it, if in fact it is infringing.

The court below thought that a narrow scope should be given to the claims of the patent in suit. In this it was in error. Slater being the first person who succeeded in producing an automatic machine for making window envelopes, he was entitled under the law to a liberal construction of the terms of his patent. If he had been a mere improver upon a prior machine by which the same general result was accomplished, the court would have been right in giving a narrow construction to his claims. But such is not the case. And the principle of the patent law is well established in this country, and indeed in England as well, that a liberal construction is to be given to a patent of the class to which the one in suit belongs.

In Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586 (1901) the Supreme Court sustained a patent to one Beach on the first automatic machine for attaching stay-strips to the corners of paper or straw board boxes. Before Beach's machine was invented it had been customary to apply the stay-strips over the joints at the corners of the boxes by pasting them down by hand. His machine applied paste to a strip of material, fed the strip over the corner of the box, cut it, and then applied the cut and gummed strip to the outside corner of the box by a die having a right-angled recess to fit that corner. The machine was based upon ideas that were familiar in a

number of the arts. The novelty did not reside in any particular thing or in any particular mechanism. The novelty existed in the fact that there was a new mechanical result. It was sought in that case to invalidate the patent by reference to a prior machine for applying the address slips to folded newspapers in which the address slip was automatically gummed, fed to the attaching devices, and cut off and attached by plungers having flat faces. The principal difference in mechanical construction between the Beach machine and the prior machines for applying the address slips was in the shape of the attaching dies, which in the box machine was so shaped as to fit the corners of the box, and which in the other machines were flat so as to apply the flat strip to the folded newspaper. The Supreme Court held that it involved invention to see that a machine used for applying the address slips to folded newspapers was adaptable to the work of the Beach device and to make such changes as were necessary to adapt that device to its new function. The invention, the court declared, consisted "rather in the idea that such change could be made than in making the necessary mechanical alterations." The Beach patent originally came before Judge Coxe in the Circuit Court for the Northern District of New York, and he sustained it upon the ground upon which it was ultimately sustained by the Supreme Court. Beach v. American Box Machine Co. (C. C.) 63 Fed. 597 (1894). This court affirmed it (Inman Mfg. Co. v. Beach, 71 Fed. 420, 18 C. C. A. 165 [1895]), and the patent was also sustained by the Circuit Court of Appeals in the First Circuit (Beach v. Hobbs, 92 Fed. 146, 34 C. C. A. 248 [1899]).

In Morley Machine Co. v. Lancaster, 129 U. S. 263, 273, 9 Sup. Ct. 299, 302. 32 L. Ed. 715 (1889), the Supreme Court, speaking by Mr. Justice Blatchford, stated the law as follows:

"Where an invention is one of a primary character, and the mechanical functions performed by the machine are, as a whole, entirely new, all subsequent machines which employ substantially the same means to accomplish the same result are infringements, although the subsequent machine may contain improvements in the separate mechanisms which go to make up the machine."

The same court had announced the same principle in McCormick v. Talcott, 20 How. 402, 405, 15 L. Ed. 930 (1857), where, speaking through Mr. Justice Grier, it said:

"If he be the original inventor of the device or machine called the divider, he will have a right to treat as infringers all who make dividers operating on the same principle, and performing the same functions by analogous means or equivalent combinations, even though the infringing machine may be an improvement of the original, and patentable as such. But if the invention claimed be itself but an improvement on a known machine by a mere change of form or combination of parts, the patentee cannot treat another as an infringer who has improved the original machine by use of a different form or combination performing the same functions. The inventor of the first improvement cannot invoke the doctrine of equivalents to suppress all other improvements which are not mere colorable invasions of the first."

In Morley Sewing Machine Co. v. Lancaster, supra, the Supreme Court sustained the validity of a patent for automatically sewing shank buttons to shoes and fabrics. The machine consisted of three groups of mechanisms: (1) A mechanism for holding the buttons in mass

and delivering them separately, in proper position, over the fabric, so that they could be attached to it by the sewing and stitching mechanism. (2) A stitching mechanism. (3) A mechanism for feeding the fabric along so as to space the stitches and consequently the buttons when sewed on.

Morley in his patent had combined these mechanisms for the first time in the art into an automatic button sewing machine, and the court held that, having done this, he was entitled to a liberal construction of his patent. The substance of the defense in that case was that there were certain specific differences between the button-feeding mechanisms of the Morley machine and of the Lancaster machine which was alleged to infringe, and also that there were certain specific differences between their sewing mechanisms; and hence no infringement. The Supreme Court held that, notwithstanding the existence of these specific differences between the mechanisms of the two machines, the Lancaster machine infringed the Morley patent.

The rule laid down in the Lancaster Case is applicable to the patent in suit. That there were specific differences between the patent in suit and defendant's machine is true. Those differences the court below stated as follows:

"In the Kienast machine the transparent patch is produced by the machine from a continuous web of transparent paper instead of being produced outside of the machine, and a patch is formed for each individual blank, as the blank arrives in position to have the patch applied to it. This individual patch is lowered without pressure and entirely free and separate from the remainder of the patch material until it comes into contact with the gummed surface around the window opening of the envelope blank, whereupon the mechanism which lowered it rises and leaves it, without the previous application of sudden impact or pressure upon the blank."

The court below thought that, while these differences might be slight, they were sufficient to deny a decree on the ground of infringement, "in view of the narrow scope which must be given to the claims of complainant." But, as we have pointed out, the patent in suit is not to be given a narrow but a liberal construction, and "the slight differences" referred to amount to an infringement of the patent, the invention being of a primary character, as the defendant's machine employs substantially the same means to accomplish the same results that the complainant's machine accomplishes. The defendant's machine has each and every element that is found in the complainant's machine, and they are combined in the same way and produce the same result. It is immaterial that in the two machines the patches are fed to the same attaching mechanism in a somewhat different but equivalent manner.

The testimony shows that the defendant's machine has essentially the mechanism of the complainant's machine. It embodies instrumentalities for automatically applying adhesive material around the window opening; for feeding the gummed blank forward over the pressing table; for registering the blank on the pressing table; for applying a transparent patch to the blank to cover the window opening and overlap the gummed margin around the opening; for applying pressure to the transparent patch to secure its firm adhesion to

the envelope blank; and for removing the envelope blank with the patch attached thereto from the pressing table.

The combination described in claim 5 of the patent in suit is embodied in defendant's machine in that it combines the following elements: Mechanism for gumming around an opening in the blank; mechanism for folding the blank; mechanism for feeding the blank from the gumming to the folding mechanism with an intervening period of dwell; and mechanism between the gumming and folding mechanisms for applying a patch over an opening in the envelope blank.

The combination described in claim 15 of the patent in suit is embodied in defendant's machine in that it combines mechanism for gumming an envelope blank around an opening therein and mechanism for folding the flaps of the blank; means for feeding the blank from the gumming mechanism to the flap folding mechanism; and mechanism interposed between the gumming mechanism and the flap folding mechanism for applying a patch to the blank to cover the opening therein.

It is immaterial that in the two machines the patches are fed to the same attaching mechanism in a somewhat different manner. In complainant's machine the patches are fed downwardly from a pile of patches and in defendant's machine they are fed and cut from a continuous strip. But, so far as the patch attaching mechanism is concerned, the essential thing is that the patch should be fed to a patch holder at a point directly over the window of an envelope blank. This is done in both machines. After the patch has been fed into the holder in each machine, the attaching mechanism applies the patch in the same way. The attaching box in each machine is lowered so that the patch rests upon the gummed edge of the window hole. It may be true that in the complainant's machine a stronger pressure is used in the lowering of the plunger onto the gummed blank, and that a lighter pressure suffices in defendant's machine. But both machines, in our opinion, use some degree of pressure, and it cannot be said that plaintiff's machine requires pressure upon the blank and defendant's machine does not. However that may be, it cannot be decisive of the question involved.

Defendant claims that his machine is an improvement on the machine of the patent in suit in that more patches can be contained in a roll of transparent paper than can be put into the magazine patch holder of the Slater machine, and that the stoppages, each taking a few seconds, for the renewal of the patches, are less in number in his machine than in the machine of the complainant. We are not concerned to inquire particularly whether this be as claimed. It may be true, although the complainant insists that the theoretical loss of time in putting patches in bunches into the patch receptacle of the Slater machine "is infinitesimal and negligible." But, conceding that in the particular mentioned the Kienast machine has improved upon the Slater machine, the fact remains that the improvement cannot save the defendant from the charge of infringement.

Patent No. 893,105, issued by the United States Patent Office to William D. Slater, being valid and infringed by defendant, the

decree of the court below is reversed, and a decree for injunction and accounting is to be entered in pursuance of the prayers of the bill of complaint.