AITCHESON *et al.* v. THE ENDLESS CHAIN DREDGE *et al.*

(*District Court, E. D. Virginia.* October 17, 1889.)

1. ADMIRALTY—JURISDICTION—STEAM-DREDGE.
   A steam-dredge, which is a floating scow fitted with appliances for deepening channels of navigation, is a subject of admiralty jurisdiction.

2. SAME—POTOMAC RIVER—SERVICE OF PROCESS.
   By the eleventh article of the compact of 1785 between Maryland and Virginia it was provided that "process from the state of Virginia may be served on any part of the said [Potomac] river upon any person or property of any person not a citizen of Maryland, indebted to any citizen of Virginia, or charged with injury by him committed." Defendant was a citizen of Virginia, and the vessel seized was seized on that part of the Potomac river lying between the District of Columbia and that portion of Virginia contained within Alexandria county, which had been originally ceded by Virginia to the United States as part of the District of Columbia, and retroceded to Virginia by the United States in 1846. *Held,* that under the cession from Maryland to the United States of the District of Columbia, and by implied cession from the District of Columbia, admiralty process from the eastern district of Virginia might be validly and effectively served on the Potomac river, where the vessel was seized.

3. MARITIME LIENS—MATERIALS AND REPAIRS—NON-DELIVERY.
   Materials and repairs were contracted to be furnished to a steam-dredge by libelants, which were actually furnished and paid for in chief part. The manufacture of the remaining materials was almost finished, and would have been ready for delivery, when work was suspended, and delivery not made, owing to a sale of the dredge without any provision for the acceptance of the materials or for the payment for their manufacture having been made. *Held,* that a lien attached to the dredge for the materials, notwithstanding they had not been delivered.

4. SAME—VESSEL IN HOME PORT.
   Although the vessel libeled was a domestic vessel, built at and belonging to the port of Alexandria, she was liable to admiralty process for materials and repairs furnished in her home port. The general rule that vessels are not so liable in their home ports is qualified by excepting the vessels of those states which by express legislation have given a right of action *in rem* for materials and repairs furnished them at home, which right of action is conferred by Code Va. § 2963.

In Admiralty. Libel for materials and repairs.
*Francis L. Smith* and *Edmund Burke*, for libelants.
*Samuel G. Brent*, for respondents.

HUGHES, J. This is a libel *in rem* and *in personam* against a dredge called "The Endless Chain Dredge," now lying in the Potomac river, above the long bridge which crosses the Potomac from Washington city; and against "The River & Harbor Dredging Company," which built the dredge at the city of Alexandria, and was its owner, and as such entered into the contract which is the subject of this libel. "The River & Harbor Dredging Company" is a corporation of the state of Virginia. The libelants are citizens of Alexandria. The libel is for materials and re_

pairs furnished and contracted to be furnished by the libelants to the Endless Chain Dredge. Some of the materials were actually furnished, and paid for in chief part. But most of the materials were of form and character peculiarly suitable to the endless chain dredge, and of no value to any other vessel. The manufacture of these materials had been well-nigh completed, and would have soon been ready for delivery; but work on them was suspended, and delivery of them not made, in consequence of a sale of the dredge, without any provision for the acceptance of the materials mentioned, or for paying for their manufacture, having been made, either by the purchasers of the dredge, or by its first owners, "The River & Harbor Dredging Company." The purchasers of the dredge had previous notice of the claim of the libelants. Such is the state of affairs out of which this libel has grown.

The respondents resist the claim of the libelants on three grounds, viz.: (1) That a dredge is not a vessel liable to admiralty process; (2) that the materials libeled for were never delivered to the dredge, and that in consequence no lien attached in favor of the libelants upon the vessel for them; (3) that the Potomac river, in which the dredge lies, is wholly within the jurisdiction of the District of Columbia by cession from Maryland, the proprietary right of Maryland having always embraced the river to low-water mark on its southern bank.

1. As to the question whether a steam-dredge, which is a floating scow fitted with steam appliances, buckets, and scoop, for deepening channels of navigation and like purposes, is a subject of admiralty jurisdiction, there have been repeated decisions in the United States and Great Britain in the affirmative. See *The Hezekiah Baldwin*, 8 Ben. 556; *The Alabama*, 19 Fed. Rep. 544, affirmed on appeal, 22 Fed. Rep. 449; *The Pioneer*, 30 Fed. Rep. 206; *Woodruff* v. *A Scow*, Id. 269; and *The Mac*, L. R. 7 Prob. Div. 126. This court has also held likewise, incidentally, in *Maltby* v. *A Steam Derrick*, 3 Hughes, 477; and *Coasting Co.* v. *The Commodore*, *post*, 258, (which was a dredge case, decided by me at Norfolk.)

2. As to the question whether what is improperly called a "lien" in admiralty attaches to a vessel on a contract for materials and repairs which have not actually been delivered on board of her, there can be no doubt on principle that the liability exists. In admiralty the vessel is regarded as the contracting party. She is treated as a sentient being. She is sued in her own name, and process is awarded against her as the defendant who has made the contract on which the libel is brought. True, that the owner may also, on the same contract, be sued *in personam* in the same libel in which the vessel is sued *in rem;* but this remedy is only cumulative. The suit in chief is the libel against the vessel *in rem*, and the other proceeding is incidental. The vessel being the contractor, when she orders machinery, materials, and repairs, she puts it out of her power to refuse to accept, or by a subsequent sale to obstruct the delivery of, the things contracted for. It is her contract for the materials which binds her, without any reference to the delivery or non-delivery of the articles bargained for. The right of a libelant to sue and

arrest the ship herself is the *privilegium* which admiralty law (which is a law of the world) gives to the person with whom she has contracted; and the *privilegium* exists whether the conditions of an ordinary lien, under the local common or statute law, obtain or not. This *privilegium* to sue and arrest a vessel arises on her contracts whether the claim be *ex contractu* or *ex delicto*, whether it arises on contract or in tort. In the case against the dredge, the Commodore, last above cited, that dredge had been engaged in opening a channel to a basin of water at Cape Charles city, Va. She had used an anchor, which she had planted at the mouth of the channel while engaged in her work, and, after its completion, had negligently left the anchor at the bottom of the mouth of the channel, and had gone away to some other locality. The steamer Jane Moseley, in afterwards entering that channel, had been badly snagged and damaged by the anchor, and libeled the dredge for the tort. In that case I held that a dredge was subject to the admiralty jurisdiction, and was liable to arrest and decree for the tort. She would have been just as liable for a contract as for a tort.

3. As to the question whether admiralty process from the eastern district of Virginia may be validly and effectively served on the waters of the Potomac below Georgetown, this right exists by cession from Maryland, and indirectly, for the purposes of the case at bar, by implied cession from the District of Columbia. I avail myself largely of the learned note of counsel for libelant in what I shall say on this subject. The claimants, in their answer, as matter of defense deny the jurisdiction of the court, because the vessel arrested was seized upon that part of the Potomac river lying between the District of Columbia and the portion of Virginia contained within the boundaries of Alexandria county. This territory was ceded by Virginia to the United States, and formed a part of the District of Columbia. On July 9, 1846, the congress of the United States retroceded this territory to Virginia, by an act, of the first section of which the following is a copy:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that, with the assent of the people of the county and town of Alexandria, to be ascertained as hereinafter prescribed, all of that portion of the District of Columbia ceded to the United States by the state of Virginia, and all the rights and jurisdiction therewith ceded over the same, be, and the same are hereby, ceded and forever relinquished to the state of Virginia, in full and absolute right and jurisdiction, as well of soil as of persons residing or to reside thereon." 9 St. at Large, 35.

So that the contention here is as to the jurisdiction over the waters of a public navigable river, lying between two sovereign powers. The title of the United States to the District of Columbia, as now constituted, rests upon a grant and cession made by the state of Maryland. The United States, as to such territory, did not and could not acquire any greater rights, jurisdiction, or authority than were possessed by the state of Maryland at the date of such grant and cession. Before the acquisition by the United States of the District of Columbia, the sovereign states of Virginia and Maryland entered into a solemn treaty and convention,

by which the navigation and use of, and jurisdiction over, the river Potomac were mutually settled and determined. The rights of the United States being derived by grant from the state of Maryland, as to that portion of the state of Maryland constituting the District of Columbia, were acquired in subordination to such convention and treaty, which has ever since remained in full force and vigor, and which, in addition, has received the recognition of the congress of the United States. See 20 St. at Large, 481. Without reference to said compact, the Potomac river being a great tide-water stream and estuary, presenting in many respects an uncertain boundary between two sovereign states, a concurrent jurisdiction of necessity originally arose over its waters. It has been said by a writer upon American international law that it is "a principle of American public law that, where the middle of a navigable river or lake or bay forms the dividing line of states, or an intangible line upon their waters, a concurrent jurisdiction, civil and criminal, arises over such waters to the states upon the opposite shores. It extends over the whole of the dividing waters, unless it was otherwise stipulated, before the adoption of the constitution of the Union, by state compact, or since, by such compact, with the assent of congress." Gard. Inst. 209; *Church* v. *Chambers*, 3 Dana, 278; *Hundly's Lessee* v. *Anthony*, 5 Wheat. 374; *Carlisle* v. *State*, 32 Ind. 55; *Sherlock* v. *Alling*, 44 Ind. 184; *People* v. *Railroad*, 48 Barb. 478. The same principle was applied to all cases among nations where their boundaries divide navigable waters. The line being incapable of sight and ready perception, a concurrent jurisdiction must exist on the dividing waters. Gard. Inst. 209, 210. Such being the law of nations, applicable to states, the following articles of convention and treaty will be found in the compact of 1785 between the contracting states, Maryland and Virginia:

1 Rev. Code Va. 1879, p. 53: "*Sixth.* The river Potomac shall be considered as a common highway for the purpose of navigation and commerce to the citizens of Virginia and Maryland, and of the United States, and to all other persons in amity with the said states, trading to or from Virginia or Maryland."

It is apparent by the terms of this article of the treaty that each of the parties to the compact was entitled to such authority, jurisdiction, and power over the waters of the river Potomac as would entitle their respective judicial tribunals to exercise admiralty jurisdiction in said waters. By the express terms of this article of the treaty the said river was to be a common highway of navigation and commerce for the citizens, not only of the two contracting states, but of the citizens of all the United States, and of the citizens of all nations in amity with them. Admiralty jurisdiction is the life of navigation and a constituent element of commerce, for without the power to enforce maritime liens commerce would decay, and navigation be rendered impossible. Moreover, "a right to navigate a river draws to it a right to moor vessels to its shores, to land on them in case of distress, or for other necessary purposes, etc. This principle was founded in natural reason, was evidenced by the common sense of mankind, and declared by the writers before quoted."

Wheat. Int. Law, § 202. The following is an extract from the eleventh article of the compact of 1786:

"And process from the state of Virginia may be served on any part of the said rivers upon any person, or property of any person, not a citizen of Maryland, indebted to any citizen of Virginia, or charged with injury having been by him committed."

That is to say, process *in personam* and process *in rem* may each be served, either on claims arising in contract or in tort. The defendant at bar, the River & Harbor Dredging Company, chartered under the laws of the state of Virginia, is a citizen of Virginia, and being such citizen, is not embraced in the exception provided in the eleventh article in favor of citizens of Maryland; and hence this case, by the express terms of said compact, is one in which this court has jurisdiction. Process can only emanate from judicial tribunals, and the expression "persons or property" show it to have been the intention of the treaty that the process should issue in proceedings *in rem* as well as *in personam*. Proceedings in admiralty were necessarily in the contemplation of the treaty-making parties, as well as the ordinary proceedings at common law; for at that time the states had not been divested of their admiralty jurisdiction, the federal constitution not having been ratified until 1787–88. The federal constitution vested in the federal tribunals all the admiralty jurisdiction theretofore possessed by the states, and this court possesses all the admiralty jurisdiction which the state of Virginia had possessed prior to the adoption of the constitution of the United States, and all such other admiralty jurisdiction as may have been conferred by said constitution and laws made in pursuance thereof. If this court were without jurisdiction on the vast area of navigation formed by the Potomac river from Georgetown to the Chesapeake bay, the commercial classes would be remediless in a large number of cases of maritime torts and contracts, because of the fact that the state of Virginia is without constitutional authority to endow its tribunals with admiralty powers. It was never contemplated that such a state of affairs could by possibility exist, for the prime object of our government was to secure to all citizens an equal distribution of public protection, rights, and blessings.

A fourth objection to the proceedings in this case, raised in a brief very lately received from respondent's counsel, is that the Endless Chain Dredge is a domestic vessel built at and belonging to the port of Alexandria, and that, under several decisions of the supreme court of the United States, she is not liable *in rem;* the general rule being that a vessel is not liable to admiralty process in her home port for materials and repairs furnished there. It is true that the supreme court has held generally that vessels are not so liable in their home ports; but it has qualified the general ruling by excepting the vessels of those states which, by express legislation, have given a right of action *in rem* against home vessels for materials and repairs furnished them at home. The general ruling was founded on the presumption that in a home port materials and repairs would naturally be furnished on the credit of the owner, not on the credit of the ship; and the exceptional ruling was founded on the

equally natural presumption that, if a state gave material-men a right of action against the vessel *in rem*, these men would furnish materials and repairs on the credit of the vessel, rather than of the owner. Hence the supreme court necessarily held that the admiralty courts could properly, in states which give the *privilegium*, entertain libels *in rem* against domestic vessels.

It is hardly necessary for me to cite section 2963 of the Code of Virginia as showing that this state has given the right of action and lien under consideration upon steam-boats and other vessels, rafts and river craft, owned or found within the jurisdiction of Virginia.

There are some credits due upon the account of libelants, filed with their libel. These admit of easy adjustment between counsel, otherwise I will refer the accounts to a commissioner for settlement. I will then decree for the libelants.