BOWERS HYDRAULIC DREDGING CO. v. FEDERAL CONTRACTING CO.

(District Court, S. D. New York. June 27, 1906.)

ADMIRALTY—JURISDICTION—SUIT FOR HIRE OF DREDGE.

A court of admiralty has jurisdiction of a suit to recover the hire of a Bowers hydraulic dredge, intended to operate afloat, and generally used for maritime purposes, and should not decline such jurisdiction because the dredge was temporarily used for a partly land transaction in dredging material from a stream for the purpose of depositing the same by means of its pipes on land of the charterer.

In Admiralty. Action to recover hire of dredge.

Horace L. Cheyney, for libellant.

Edward W. Norris, for respondent.

ADAMS, District Judge. This action was brought by the Bowers Hydraulic Dredging Company against the Federal Contracting Company to recover the hire of Dredge No. 2, under a written contract to pay $3,000 per month, from July 1st to July 24th, 1905, amounting to $2,322.48. The respondent defends, (1) on the ground that the dredge was not able to do the work which it was represented she could do, and (2) because the court has no jurisdiction of the cause of action.

1. It appears that the respondent paid the hire of the dredge for the months of April, May and June, 1905, and the testimony did not show any condition which differed materially in July. The dredge did all the work that the libellant undertook that she should do, or which could reasonably have been expected of her. The contract did not provide that she should be adapted to the pumping of the bricks and stones which were met with and had the effect of retarding her work in July, so that then she did not always work up to the guaranteed

capacity. I found nothing in the testimony on the trial to warrant any deduction from the claim of the hire sued for.

2. The parties have entered into the following stipulation, which determines the facts necessary to be considered on the question of jurisdiction, viz.:

"The parties to this action, in order to avoid the transcribing of the minutes of trial, hereby stipulate and agree, as follows:

On May 20th, 1905, the libellant and respondent entered into a contract (a true copy of which is attached to the libel) whereby the libellant let unto the respondent, its hydraulic dredge and appurtenances, including necessary pontoons, discharge pipe including 2000 feet of shore pipe, derrick scow and two coal scows, for and during the working season of 1905. The respondent agreed to pay for the use of the dredge and its appurtenances the sum of Three thousand dollars per month.

The agreement above referred to contained, inter alia, the following provisions:

'Said dredge and appurtenances to be used as the charterer or its agents may direct in dredging material and putting same ashore on the property of the Hackensack Meadows Company, located on the Passaic and Hackensack Rivers, N. J., or at such other localities as said charterer may direct.'

'Notwithstanding anything hereinbefore contained the charterer shall have the option and privilege of cancelling this charter after said dredge has been in its service for three months if at the expiration of that period it is found unsuitable for its business, it being understood and agreed that said dredge shall be able to deposit on shore an average of 300 cubic yards of material, scow measurement, through 2000 feet of land pipe per hour.'

'The charterer during the term of this charter party shall have the sole and absolute possession, control and management of said dredge and its officers and crew and all the legal rights and privileges of owners.'

At the time the contract was entered into, the dredge and its appurtenances were lying in the Delaware River, at Camden, N. J. The dredge was towed from that place to the Passaic River by way of the Delaware Bay and the Atlantic Ocean.

The dredge was thoroughly equipped for ocean voyages and theretofore had made several voyages to different ports on the Atlantic coast. The dredge however had no motive power of her own and was towed upon these various voyages by tug boats.

The scows and pontoons were towed from Camden by way of the Delaware River, Delaware and Raritan Canal, etc. to the Passaic River.

The libellant's dredge was intended to operate afloat and contained machinery, consisting of rotary cutters for digging the mud beneath the water and centrifugal pumps by which the sand, mud and material loosened by the rotary cutters and drawn up in a state of solution were forced through lines of pipe to place of deposit, and certain engines for the operation of the machinery on the dredge.

While the libellant's dredge was employed under this contract her discharge pipe extended continuously from the dredge to a point about 1,200 feet on shore, and the dredge material was deposited at about that distance from the bank of the river. The pipe was carried from the dredge on pontoons to the shore and thence on the land to the place where the dredged material was discharged from the pipe and deposited.

Mr. Somers, the President of the Libellant Company, testified that at the time the contract was entered into, it was understood that the material to be dredged should be brought by scows from the vicinity of New York harbor. This was objected to by respondent's counsel and an exception taken.

Upon the arrival of the dredge in the Passaic River, the respondent commenced to use her in digging two or three basins for the reception of dredged material to be brought by scows from other points. The material dug or dredged out of these two or three basins was pumped ashore.

The dredge was occupied in digging these two or three basins until the

latter part of June or the early part of July, 1905, when the respondent obtained permission to dump dredged material in the basins which had been dug out, and thereafter about 18 scows of dredged material were brought from the Bay Ridge District and certain other dredged material was brought by scows from other portions of the Passaic River, all of· which was dumped into the basins above referred to. The material so dumped into these basins was then dredged by the libellant's dredge and pumped ashore.

All of the material which was dredged by the libellant's dredge out of these basins was pumped ashore on lands of the Hackensack Meadow Company, and the dredge was not employed in deepening the channel."

The libellant contends it is settled law that a court of admiralty has jurisdiction over dredges, citing The Alabama (C. C.) 22 Fed. 449; The Pioneer (C. C.) 30 Fed. 206; Aitcheson v. Endless Chain Dredge (C. C.) 40 Fed. 253; The Atlantic (D. C.) 53 Fed. 607; The Starbuck (D. C.) 61 Fed. 502; Saylor v. Taylor, 77 Fed. 476, 23 C. C. A. 343; The International (D. C.) 83 Fed. 841; McMaster v. One Dredge (D. C.) 95 Fed. 832. The· distinction, however, between those cases and the one under consideration is in the method of disposing of the dredged material. In addition to the above authorities, there is cited McRae v. Bowers Dredging Company (C. C.) 86 Fed. 344. The latter was a case where it was sought to subject a dredge, in insolvency proceedings, to liens for wages. It was there determined that a dredge was subject to admiralty process, where she was used for cutting water ways and filling tide flats. Judge Hanford there said (page 346):

"The main question in the case is whether the dredgers are vessels subject to admiralty process, whether the work which they were doing was a maritime service, whether the contracts under which they were supplied and kept in repair are maritime and whether their crews have maritime liens for their wages. The writers and judges who have expounded maritime laws and the rules by which the jurisdiction of admiralty courts must be measured, have not succeeded in making known any satisfactory test by which floating structures which are subjects of admiralty jurisdiction, and to which maritime liens may attach, may be distinguished from those which have no place in the realm of maritime jurisprudence. There are numerous decisions which tell that adaptibility to float on the water, masts, sails, propelling machinery, steering apparatus, capacity for carrying merchandise or passengers, and mobility, are features by which a subject of admiralty jurisdiction may be recognized; but the decisions are not at all consistent with any guiding principle which makes admiralty jurisdiction depend upon the size or shape of a vessel, her means of propulsion or her adaptability for use. According to the decisions a ship although afloat is not a ship if her original construction, rigging and furnishing remain incompleted.· Men employed on board a vessel for her preservation do not acquire maritime liens for their wages if she is out of commission; that is, if she has no voyage in contemplation. A ship is not employed in a maritime service when used merely as a warehouse to hold her cargo after the completion of a voyage, and while navigation is suspended. The actual employment of a structure designed for use in the transportation of merchandise or passengers by sea is not under all circumstances conclusive. Wharves and warehouses are necessary for the transportation and preservation of merchandise to be carried in ships to a distance, and yet such structures, although in fact instruments of commerce and aids to navigation, are not maritime vessels. Floating dry docks, used in the repair of vessels, are not maritime things. On the other hand, a private yacht or pleasure boat, not designed for nor employed in trade or commerce is a vessel which may be a subject of admiralty jurisdiction."

The contention of the respondent is that as the vessel was solely employed in dredging material and putting the same ashore, the contract was not in any sense for a maritime service and therefore was not within the authoritites which sustain liens upon dredges. The respondent cites and relies upon In re Hydraulic Steam Dredge No. 1, 80 Fed. 545, 25 C. C. A. 628, which was a libel in rem filed to recover for a supply of coal furnished to a dredge similar in character to the one involved here. Jenkins, J., in denying the lien said, for the Circuit Court of Appeals, Seventh Circuit (pages 556, 557, of 80 Fed., page 639, of 25 C. C. A.) :

"Upon the assumption that the structure in question is a ship or vessel, and within the admiralty jurisdiction, that jurisdiction will not be asserted to enforce a contract touching the ship, unless such contract is maritime in its nature. Insurance Co. v. Dunham, 11 Wall. 1. 20 L. Ed. 90. The admiralty deals alone with things pertaining to the sea. We declared in The Richard Winslow, 34 U. S. App. 542, 18 C. C. A. 344, and 71 Fed. 426, that 'a maritime contract must therefore concern transportation by sea. It must relate to navigation and to maritime employment. It must be one of navigation and commerce on navigable waters.' It was there pointed out that not every contract having reference to a ship is within the admiralty jurisdiction, but only such as relate to maritime employment, such as pertain to the navigation of a ship or assist the vessel in the discharge of a maritime obligation. It is not enough that the service is to be done upon the sea or with respect to the ship. It must relate to trade and commerce upon navigable waters. The coals furnished by libelant were supplied to the dredge while it was engaged in its work for the Illinois Central Railroad Company, and to enable it to perform that work, which was 'to fill in earth for its railroad purposes behind a line of piling on its grounds on the lake front in Chicago.' By means of its cutting apparatus, the earth on the bed of the lake was dug up, loosened and disintegrated, and, with the adjacent water, sucked up into and through a centrifugal pump, and thence discharged through a continuous line of adjustible pipes to the place of deposit upon the adjacent shore. This is not a maritime employment. The fact that the dredge floated upon navigable waters is not controlling. The dredge in the performance of that contract was not engaged in navigation, nor even in the marine transportation of the earth dug from the bed 'of the lake. To the contrary, a peculiar mechanism ·dispensed with the necessity of marine transportation. The employment related solely to the land, to the creation of an embankment upon the land for the use of a railway upon the land. The only possible relation to the sea in this employment was in this: that for the purpose of obtaining the earth, and as a necessary incident thereto, the bed of the lake was dug out, and thereby the channel was deepened. That was not, however, for the purposes of navigation. It is not suggested that vessels engaged in navigation frequented the place; that wharves were constructed or designed; or that the excavation was for the purpose of or in aid of navigation. The work was done in and for the construction of an embankment upon the land, and for railroad purposes. The earth was taken from the bed of the lake because more convenient to the place of deposit, and less expensive than when brought from a distant point of land. The effect upon the channel was incidental and subordinate. The work had no possible relation to marine transportation. It is of no moment that the structure floated upon the water, and dug out the bed of the lake. That does not give marine character to this employment. The admiralty deals with vessels which 'plow the sea,' and with contracts touching navigation. In The Richard Winslow, supra, we held that a contract for storage of grain during the closed season of navigation was not maritime. The present case falls within the principle of that decision. It may be that this structure could engage in a maritime service, and its maritime engagements brought within the jurisdiction of the admiralty. It is enough to say that in the performance of

its contract to plow the prairies of the state of Illinois, or in the construction of a railway embankment upon land, to dig up the bed of the lake, and shoot the earth through tubes for deposit on the land adjacent, it was not so employed. The supplies furnished to enable the dredge to perform a contract not maritime cannot attain to the dignity of a maritime lien."

Upon the above authorities, it would seem that the question of jurisdiction here should be decided in favor of the respondent, but the admiralty jurisdiction has been broadened very considerably by the recent decision of the Supreme Court in The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236. That was a question of the jurisdiction of the District Court for the Southern District of Alabama, arising out of the destruction of a beacon fastened to piles driven into the bottom of the Mobile river or bay by a navigating vessel. The court below, Toulmin, J. (D. C.) 122 Fed. 112, declined jurisdiction under the authorities, but the case was certified to the Supreme Court and it was there held that the action was maintainable, the court, Mr. Justice Holmes, saying (page 365, of 195 U. S., page 47, of 25 Sup. Ct. [49 L. Ed. 236]):

"The precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history. As to principle, it is clear that if the beacon had been in fault and had hurt the ship a libel could have been maintained against a private owner, although not in rem. Philadelphia, Wilmington & Baltimore R. R. v. Philadelphia & Havre de Grace Steam Towboat Co., 23 How. 209, 16 L. Ed. 433; Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619; Panama Railroad v. Napier Shipping Co., 166 U. S. 280, 17 Sup. Ct. 572, 41 L. Ed. 1004. Compare The Rock Island Bridge, 6 Wall. 213, 18 L. Ed. 753. But, as has been suggested, there seems to be no reason why the fact that the injured property was afloat should have more weight in determining the jurisdiction than the fact that the cause of the injury was. The Arkansas (D. C.) 17 Fed. 383, 387; The F. & P. M. No. 2 (D. C.) 33 Fed. 511, 515; Hughes, Adm. 183. And again it seems more arbitrary than rational to treat attachment to the soil as a peremptory bar outweighing the considerations that the injured thing was an instrument of navigation and no part of the shore, but surrounded on every side by water, a mere point projecting from the sea."

Mr. Justice Brown, in a concurring opinion, said (pages 368, 369, of 195 U. S., page 48, of 25 Sup. Ct. [49 L. Ed. 236]):

"I accept this case as practically overruling the former ones, and as recognizing the principle adopted by the English Admiralty Court Jurisdiction Act of 1861 (section 7), extending the jurisdiction of the admiralty court to 'any claim for damages by any ship.' This has been held in many cases to include damage done to a structure affixed to the land. The distinction between damage done to fixed and to floating structures is a somewhat artificial one, and, in my view, founded upon no sound principle; and the fact that Congress, under the Constitution, cannot extend our admiralty jurisdiction, affords an argument for a broad interpretation commensurate with the needs of modern commerce. To attempt to draw the line of jurisdiction between different kinds of fixed structures, as, for instance, between beacons and wharves, would lead to great confusion and much further litigation."

It seems in view of what has been said in this authority that such artificial distinctions as arise out of the work of a dredge being performed partly on land and for the purpose of a land transaction, should not oust the court of jurisdiction of a floating structure which in its ordinary purpose is distinctly maritime. Boni judicis est ampliare jur-

isdictionem, which properly interpreted means, that it is the duty of courts to amplify their remedies, and without usurping jurisdiction, to apply their rules, to the advancement of substantial justice. Broom's Legal Maxims, pp. 79, 80.

Decree for the libellant for $2322.48, with interest.