**BETHLEHEM STEEL COMPANY, Maryland Shipbuilding & Drydock Co.**

v.

**UNITED STATES.**

**C.D. 2500.**

United States Customs Court,
Second Division.

Dec. 30, 1964.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue and David O. Elliott, New York City, of counsel), for plaintiffs.

John W. Douglas, Asst. Atty. Gen., Richard J. Kaplan, Brooklyn, N. Y., Trial Attorney, for defendant.

Before LAWRENCE, RAO, and FORD, Judges.

LAWRENCE, Judge.

The Bethlehem Steel Company and the Maryland Shipbuilding & Drydock Co., plaintiffs herein, brought into the United States at the port of Baltimore, Md., two so-called "midbodies."

They were classified by the collector of customs within the provision for "Articles or wares not specially provided for, * * * whether partly or wholly manufactured * * * in chief value of steel" in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 19 per centum ad valorem.

Pursuant to the provisions of section 514 of said act (19 U.S.C. § 1514), the plaintiffs filed protests 63/17334 and 63/19252, respectively, which have been consolidated for trial.

Plaintiffs rely upon the claim that the midbodies are not "Articles or wares" within the meaning of paragraph 397, supra, but are "vessels," as defined in section 401(a) of said act (19 U.S.C. § 1401(a)); also section 3, 1 U.S.C., and, as such, under the time-honored doctrine announced in The Conqueror case, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897), are exempt from customs duties. That decision will be reviewed, infra. The claim was also made for classification as structural shapes within the purview of paragraph 312 of said act (19 U.S.C. § 1001, par. 312), as modified.

The statutory definitions above referred to read as follows:

Section 401(a) of the Tariff Act of 1930:

"VESSEL.—The word 'vessel' includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft."

Section 3, 1 U.S.C.:

"Vessel" as including all means of water transportation.

"The word 'vessel' includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

The differences in the phraseology of the definitions are insignificant and unimportant here.

Our first inquiry, therefore, is whether said midbodies are "vessels" within the meaning of that word, as judicially interpreted.

A careful review of the evidence and the numerous judicial authorities cited by the parties in their well-prepared briefs leads us to the conclusion that the question posed above must be answered in the affirmative.

The following three witnesses were called at the trial all of whom testified on behalf of the plaintiffs: John D. Frack, vice president in charge of the engineering and estimating division of the Maryland Shipbuilding & Drydock Co.; Lester Rosenblatt, president and naval architect of the firm of M. Rosenblatt & Son, Inc.; and Ralph A. Leaf, assistant manager of the Baltimore yards of the shipbuilding division of the Bethlehem Steel Company.

These witnesses were exceptionally well informed highly trained experienced experts in the field of naval engineering and architecture. Their testimony was without conflict. It was clear, concise, and convincing.

It appears from the evidence that the midbodies in controversy were constructed in European shipyards in accordance

with conventional designs, plans, and specifications prepared by naval architects which conformed to the accepted standards in the construction of watercraft generally and approved by governing bodies, such as the American Bureau of Shipping, the United States Coast Guard, and the United States Public Health Service.

The midbodies were over 500 feet in length and had a cargo capacity of between 12,000 and 14,000 tons. In order to facilitate their transatlantic voyage, they were equipped with a temporary bow and additional stiffeners were used to strengthen the stern. Furthermore, each craft had sleeping accommodations for a crew of eight men, each of whom had signed ships' papers for the crossing. They were equipped with light, heat, power, food, radio facilities, and navigational lights and signals in order to comply with navigational rules of the road and to indicate that the craft were under tow, as required by law for vessels only. (33 U.S.C. §§ 144(c) (i), 145(b), and 145c(a)).

Upon their arrival in this country, the midbodies were suitable for use as vessels of the barge type for commercial use in the transportation of cargo. They were designed for ultimate use as cargo sections of self-propelled ore carriers on the Great Lakes.

The evidence also discloses that each craft carried marine insurance (plaintiffs' exhibit 7) which was secured for protection against damage or loss of the craft in transit and which also served as coverage for the crew of eight who manned the craft while crossing the ocean. In addition to the foregoing, the midbodies were equipped with liferafts, life preservers, anchor and chain, and a generator for light, heat, and messing.

With these considerations in mind, we turn now to The Conqueror case, in which the Court thoroughly examined pertinent statutes relating to the administration of customs as early as the Tariff Act of 1789, noting that—

" * * * By the very first act passed by Congress in 1789, subsequent to an act for administering oaths to its own members, a duty was laid upon 'goods, wares and merchandise,' imported into the United States, in which no mention whatever is made of ships or vessels; but by the next act, entitled 'An act imposing duties on tonnage,' a duty was imposed 'on all ships or vessels entered in the United States' * *."

Further, the Court observed—

" * * * This distinction between 'goods, wares and merchandise' and 'ships or vessels' has been maintained ever since, * * *."

The Court was there considering whether the foreign-built yacht, "The Conqueror," owned by an American citizen, was subject to an imposition of customs duties pursuant to the Tariff Act of 1890 upon its arrival in the United States.

In a thorough and well-considered opinion, after reviewing legislation, the Court remarked—

" * * * It is scarcely possible that if congress had chosen to impose duties upon such yachts, or had supposed them subject to duty as imported articles, it would have also discriminated against them by requiring them to pay tonnage fees. In this, the latest expression of the legislative will, congress seems to have recognized the theory, which we have already gathered from the prior course of legislation, that vessels should be treated as a class by themselves, and not within the general scope of the tariff acts.

"In view of the elaborate opinion of the district judge upon this branch of the case, it is unnecessary to extend this discussion further. We think that the liability of ships and vessels to tonnage dues and to light money, except where a certain class of vessels is specially exempted, shows that it was not the intention

of Congress to treat them as dutiable articles. \* \* \*"

It having been definitely determined that vessels are not goods, wares, or merchandise, which latter are subject to customs duties, we come to the point where we must decide whether midbodies of the type above described are "vessels," as that term is defined in the statute and as construed by the courts.

In order to support their contention that the midbodies in controversy are vessels, plaintiffs have cited several decisions of this court and other Federal courts which point up the distinguishing marks and characteristics which identify a "vessel."

One of the earlier cases is that of The International, 3 Cir., 89 F. 484 (1898), where a dredge and two scows were held to be vessels and not subject to customs duties. In the opinion of the court, it was unimportant that the dredge was not designed to carry passengers or cargo for hire. As stated by the court—

"The fact that dredges and scows are not subject to all the regulations and provisions of law applicable to vessels carrying passengers or merchandise for hire and engaged in foreign or domestic commerce, cannot affect their legal status as vessels or render them dutiable. \* \*"

In J. G. Hitner v. United States, 21 Treas.Dec. 275, T.D. 31898 (1911), this court, then known as the Board of General Appraisers, was concerned with the question whether the steamship "Altenburg," which traveled self-propelled from Havana to Philadelphia, was subject to customs duties which had been imposed by the collector of customs. In the course of its opinion, the court noted that the vessel appeared—

"\* \* \* to have been properly entered and the usual tonnage and port dues paid. \* \* \*"

The craft could not be sold as a vessel because it had been broken up into scrap. Further, the court said—

"\* \* \* That a vessel afloat is not 'merchandise' under our tariff law and not an imported article was settled in the case of The Conqueror (166 U.S., 110 [17 S.Ct. 510, 41 L. Ed. 937]). Duties attach on imported goods according to their condition at the time of their importation. United States v. Irwin (2 Cir., 78 Fed.Rep., 799). The use to which an article will be ultimately put is not to be considered unless a statute so provides, and articles legally brought into the country may not be followed for the purpose of learning their use and with the purpose of assessing a duty in accordance with such use unless the particular provision of the law would require such action. United States v. Wotton ([1 Cir.] 53 Fed.Rep., 344)."

The court held that the Altenburg was a vessel at the time it arrived in the United States and, consequently, not subject to customs duties since it was not imported merchandise when it entered the country.

In Tregoning Boat Co. v. United States, 15 Cust.Ct. 196, C.D. 971 (1945), a so-called boat hull, 17 feet long, 7 to 7½ feet in breadth, and approximately 30 inches deep, arrived at the port of Seattle as cargo on board a steamer. It appears from the opinion of the court—

"\* \* \* In the condition as imported it was equipped with oars and oarlocks, and though provision was made for a mast, none was imported with it. Sails and a rudder, as well as food, water, rope, and signaling equipment, were supplied in the United States. In its completed condition the hull was to be placed aboard a three- or four-thousand-ton vessel to be used as a lifeboat."

Further, the court stated—

"The record shows that in the condition in which it arrived it could accommodate 12 persons and was capable of being used for the purpose of transporting persons over water, including the high seas, and that it had been constructed in accordance with American and Ca-

nadian lifeboat laws for that purpose."

The court was also of the opinion that the status of the lifeboat hull as a vessel was not affected by the fact that it was not documented or subjected to tonnage duties, citing United States v. Porto Rico Coal Co., 17 CCPA 288, T.D. 43716, and The International, supra.

In conclusion, the court observed—

"Under the definition of 'vessel' contained in 1 U.S.C. § 3, as construed by the courts, *present and continuous use as a means of transportation on water is not required; capability of practical and substantial use is sufficient.* [Italics supplied.]

"The lifeboat in question was, on its arrival in the United States, a 'vessel,' and not being of the character of vessels specifically provided for in the tariff act, was not subject to duty thereunder. * * * *"

█ It is true, of course, that not all watercraft legally respond to the statutory definition of "vessel." Thayer v. United States, 2 Ct.Cust.Appls. 526, T.D. 32252, and Hitner Sons Co. v. United States, 13 Ct.Cust.Appls, 216, T.D. 41175.

In the Thayer case, certain foreign-made racing shells were brought into this country on board the steamship "Cambrian" for the use of the Harvard University crew. The court recognized that these racing shells were not designed for transportation, except for the crew of eight or nine men for the purpose of racing in competition, and that they would not be used for transporting persons or property from one place to another to any substantial extent. In the course of its opinion, the court observed—

" * * * A temporary, fugitive, impractical, although possible, use for transportation of articles or things of trifling weight in smooth water only and for short distances we do not think could possibly answer the call of the statute."

It was, accordingly, held that racing shells were not vessels and were properly classified for duty as a manufacture of wood.

In the Hitner case, it appears that the "Niobe," a onetime armored cruiser, had been used for patrol duty in Canadian waters. In 1915, it had been condemned, removed from active service, and dismantled, its guns and ammunition had also been removed. After being severely damaged by an explosion in Halifax Harbor and after unsuccessful attempts had been made to repair the machinery, the Niobe, being then unable to maintain steam or to propel herself, was towed to the port of Philadelphia. The court concluded that, since the Niobe was not engaged in or suitable for commerce or navigation, or as a means of transportation on water, but was fit only for scrap or junk, it was not a vessel and, therefore, was dutiable as imported merchandise.

Plaintiffs have also drawn our attention to a large number of Federal court decisions arising in admiralty jurisdiction. We deem it entirely proper and appropriate to consider those cases particularly so inasmuch as they deal with the meaning of the word "vessel" in substantially the same statutory context. Many of those cases were cited by our appellate court in the Hitner case involving the classification of the Niobe. Without analyzing those cases in detail, a brief summary of them is here set forth:

Disbrow v. Walsh Brothers, D.C., 36 F. 607; The Wilmington, D.C., 48 F. 566; The Dick Keys, Fed.Cas.No.3,898; Ex parte Easton, 95 U.S. 68, 24 L.Ed. 373. Barges, without power of self-propulsion, were held to be "vessels."

Endner v. Greco, D.C., 3 F. 411; The General Cass, Fed.Cas.No.5,307; In re Eastern Dredging Co., D.C., 138 F. 942. Scows, capable only of moving when towed and used for the transportation of mud and similar substances, were held to be "vessels."

Seabrook v. Raft of Railroad Cross-Ties, D.C., 40 F. 596; The Annie S. Cooper, D.C., 48 F. 703. Rafts of lumber were held to be "vessels."

The Hezekiah Baldwin, Fed.Cas.No. 6,449. A floating grain elevator was held to be a "vessel." It appears that the craft had no motive power for self-propulsion and no space for cargo. In the course of its opinion, the court observed—

" * * * By reason of its mode of use it is made subject to the same vicissitudes and perils of the seas, to which all vessels are exposed. She may have collisions, she may require salvage services, and the same necessity for using her credit in order that she may obtain instant repairs * * *."

The Alabama, D.C., 19 F. 544, affirmed in C.C., 22 F. 449; The Pioneer, D.C., 30 F. 206; Aitcheson v. The Endless Chain Dredge, D.C., 40 F. 253; The Starbuck, D.C., 61 F. 502; Saylor v. Taylor, 4 Cir., 77 F. 476; McRae v. Bowers Dredging Co., C.C., 86 F. 344; Bowers Hydraulic Dredging Co. v. Federal Contracting Co., D.C., 148 F. 290; Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047. Dredge boats were held to be "vessels."

The Old Natchez, D.C., 9 F. 476. An old dismantled hull of a river steamboat, being refitted for use as a wharf boat in landing passengers and merchandise, was held to be a "vessel."

The following cases are also cited wherein various types of craft have been held to be "vessels" under admiralty laws:

Petition of Kansas City Bridge Co., D.C., 19 F.Supp. 419. A quarterboat serving as a floating and movable boarding and rooming house.

The O'Boyle No. 1, D.C., 64 F.Supp. 378, affirmed 2 Cir., 155 F.2d 69. A floating crane.

Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047. A barge without motive power of its own.

The Ark, D.C., 17 F.2d 446. A houseboat without motive power.

The Robert W. Parsons, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73. Canal boats drawn by animal power or taken as a tow by steamers.

Braisted v. Denton, D.C., 115 F. 428. A float used to hold oysters.

The appellate court, in the Hitner case, supra, dealing with the Niobe, referred to other cases wherein certain unique types of watercraft were held not to be vessels "as not fairly engaged in commerce or navigation": The Hendrick Hudson, Fed.Cas.No.6,355. A boat converted into a hotel and saloon by structures erected upon its old hull. Jones v. Coal Barges, Fed.Cas.No.7,458; Wood v. Two Barges, C.C., 46 F. 204. Coal barges, being merely boxes of rough lumber for floating coals and intended to be broken up at the end of their voyage. The Big Jim, D.C., 61 F. 503, a marine pump, capable of being towed, but set on piles.

In the course of its opinion, the appellate court stated—

"From these authorities some general conclusions may be deduced. In order to come within the definition of a "vessel" as fixed by section 3, Revised Statutes, the service upon which the thing in question can engage must be a maritime service. It must have some relation to commerce or navigation, or at least some connection with a vessel employed in trade. It must be engaged in, or in some sense related to commerce and navigation. The fact that the structure has the shape of a vessel, or has been once used as one, or could by proper appliances be again used as such, can not affect the question. The test is the actual status of the structure as being fairly engaged in or suitable for, commerce or navigation and as a means of transportation on water."

By applying the reasoning of the court in that case and others above cited to the

facts applicable to the subject midbodies, we are satisfied that they meet the requirements established by the courts of the term "vessel."

The statutory definition of the word "vessel" has a very wide sweep since it includes *every description of watercraft* or other *contrivance used* or *capable of being used* as a means of transportation on water. That language clearly implies a broad and liberal meaning rather than a restricted one.

Furthermore, the words "used" or "capable of being used" have different connotations and suggest not only present utility but potential utility as a means of transportation on water.

The testimony of Rosenblatt and Leaf tells us that midbodies, in their condition as imported, are well adapted for use as barges. When asked to give his reasons why in his opinion the midbody, represented by exhibit 1, is commercially usable as a barge, Rosenblatt stated—

" * * * It floats upon water. It is watertight. It can be used to carry cargo just as it is now and could be converted even to carry passengers if need be by a conversion. It is capable of safe navigation upon navigable waters. That leaves me to say that it is and can function as a barge."

When Leaf was asked whether new midbodies similar to exhibit 1 had been used as barges within his experience, he stated—

"On two separate occasions, we had barges arrive at our yard and each barge carried equipment beyond the purpose of the barge and could be considered as cargo, one barge carried from Spain to our yard some grain evacuators, part of the owner's equipment that was in Spain. Another barge was brought to us from Germany and this barge included—carried in its hold some container guides and some rail that was going to be used on another body which was going to be brought over later to one of our yards in the New York harbor. This was certainly cargo in that bunch."

Further, Leaf stated that barges to which he referred were designed to be used as midbodies, of the type illustrated in exhibit 1, and were actually so used.

In United States v. Tug Parris Island et al., D.C., 215 F.Supp. 144, 145, the Department of Justice brought a libel against a midbody in a proceeding in admiralty. It appears that the midbody was sued in an action *in rem* arising out of a collision with the Coast Guard Cutter Chilula. Libel against the midbody was dismissed after finding that it was not responsible for the damages caused by the collision.

It is clear that "vessels" are beyond the reach of customs duties (The Conqueror) unless Congress elects to make them so as in paragraph 370 of the Tariff Act of 1930.

Defendant, in its brief, refers to a number of decisions wherein it was held that certain watercraft were not vessels in the statutory sense. This is not disputed.

As pointed out earlier in this opinion, the appellate court, in the Hitner decision, recognized a seeming conflict and cited cases which have been referred to, supra. The court, however, followed what we deem to be the great weight of authority in giving a liberal interpretation of the word "vessel."

Defendant's principal line of defense is that the midbodies are "parts" of vessels and, consequently, cannot be treated as vessels within the concept of the statute.

This argument seems to proceed upon the theory that when the midbodies arrived in the United States they were parts of what ultimately became vessels —namely, ore carriers.

Of course, the tariff status of the craft must be determined by their *utility* or *capability for use* at the time of their arrival in the United States.

At that time, they had been towed on their own bottoms several thousand miles across the Atlantic Ocean.

They were seaworthy.

They had been constructed in accordance with designs, plans, and specifications carefully drawn by skilled naval engineers and architects to meet the rigid and accepted standards of navigational requirements.

They were launched in European shipyards as other watercraft would be launched.

They floated and were fully equipped for proper and safe navigation under tow to the United States.

They were capable of transporting cargo if their owners elected to use them for that purpose.

They had the physical appearance of certain watercraft commonly seen in the harbors of our port cities used as barges being towed.

The mere fact that the midbodies were to become the midsections of ore carriers did not destroy their original character as watercraft *capable of being used* as a means of transportation in water.

It is not a *sine qua non* that the purpose for which a watercraft is designed determines whether or not it is a vessel in a legal sense. The statute fixes the test by the words *"used* or *capable of being used* as a means of transportation on water."* [Italics supplied.] By the evidence, the subject craft meet that test.

Obviously, actual use for transportation on water is not the only requirement of the statute. Capability for use is an alternative. The etymology of the word "capable" implies potential ability to perform a certain task. It does not require it.

While we have a proper respect for the opinion of the Customs Bureau, as expressed in House Report 1887, U.S.Code Congressional and Administrative News, 1960, p. 2664, which accompanied the bill resulting in Public Law 86–583, 74 Stat. 321, to which reference was made in defendant's brief, we do not consider it to be binding upon our course of action.

It seems highly incongruous and unbelievable that Congress could have intended that scows, dredges, barges, elevators, log rafts, house-boats, an old hull converted into a wharf boat, and so many inferior craft should be classified as vessels (as held by the courts) and at the same time have intended that a staunch seagoing craft, possessing the requisite navigational qualifications possessed by these midbodies, should be relegated to the unenumerated catchall provision of paragraph 397 as articles of metal.

We have carefully examined the record and the numerous cases cited by adversary counsel in their briefs, and, while there is a diversity of opinion of the meaning of the term "vessel," the overwhelming weight of judicial authority has favored a liberal interpretation and application of the term to a wide variety of watercraft used for many diverse purposes.

In our opinion, the evidence places the contested midbodies within the class of watercraft judicially recognized as "vessels."

Moreover, if the question in issue were to be considered shrouded in doubt, we should be disposed to apply the ancient doctrine that a doubtful question of law, particularly in a customs case, should be resolved in favor of the importer. Hartranft v. Wiegmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887); American Net and Twine Company v. Worthington, 141 U.S. 468, 12 S.Ct. 55, 35 L.Ed. 821 (1891), and cases cited therein.

■■ It is the considered opinion of the court that the subject midbodies are "vessels" within the statutory meaning of that term and, accordingly, should not be subject to customs duties. The claim for classification as structural shapes in paragraph 312 of said act, not having been pressed, is deemed to have been abandoned. Defendant's motion made at the trial to dismiss that claim is, accordingly, granted. Defendant's objections

to the receipt in evidence of plaintiffs' exhibits 10 and 11 for identification are sustained.

Judgment will be entered in accordance with the views above expressed.