(C.D. 3891)

Todd Shipyards Corporation *v.* United States

United States Customs Court, Second Division

(Decided October 3, 1969)

*Coles & Goertner* and *William T. Lennon; Joseph F. Donohue,* associate counsel; for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Sheila N. Ziff* and *Andrew P. Vance*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges; FORD, J., concurring

NEWMAN, Judge: This case involves the dutiable status of two so-called "midbodies" constructed in West Germany, towed across the Atlantic Ocean, and entered by plaintiff at the port of New York. They were assessed with duty by the collector of customs at the rate of 19 per centum ad valorem under the provision in paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108, for articles not specially provided for in chief value of steel.

Plaintiff protested, claiming that the midbodies were entitled to duty-free entry, since they were not "articles" under section 1001 of the Tariff Act of 1930, as amended, and therefore not described or provided for in the dutiable schedules. It is further claimed that the midbodies are "vessels" as defined in section 401(a) of the Tariff Act of 1930 and section 3 of Title 1 of the United States Code.

### THE STATUTES

The pertinent statutory provisions read as follows:

Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108:

> Articles or wares not specially provided for, whether partly or wholly manufactured:
>
> \*     \*     \*     \*     \*     \*     \*
>
> Composed wholly or in chief value of iron, steel * * *:
>
> \*     \*     \*     \*     \*     \*     \*
>
> Other * * *_____ 19% ad val.

Section 1001 of the Tariff Act of 1930, as amended:

> Except as otherwise specially provided for in this Act [§§ 1001–1654 of this title], there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States * * * the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title [this section], namely:

Section 401(a) of the Tariff Act of 1930, as amended:

> The word "vessel" includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.

1 U.S.C. § 3:

> The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

For the reasons discussed *infra*, we have concluded that the mid-bodies are not "vessels" but articles of steel, as classified by the collector, and the protests are overruled.

## THE RECORD

The parties stipulated at the trial that the midbodies are similar in all respects material to this litigation to those which were the subject of *United States* v. *Bethlehem Steel Co. et al.*, 53 CCPA 142, C.A.D. 891 (1966),[1] *cert. den.* 386 U.S. 912 (1967), *reh. den.* 386 U.S. 987 (1967), wherein the appellate court reversed our decision and judgment (54 Cust. Ct. 1, C.D. 2500, 238 F. Supp. 483 (1964)), and held that the midbodies were not vessels, and hence not entitled to a duty-free status.[2] The record in that case was incorporated into the present record on plaintiff's motion, and accordingly this case represents a retrial of the issues in the prior case.

In addition to incorporating the record in *Bethlehem Steel*, plaintiff presented the testimony of two witnesses: Donald B. Wood, manager of the Marine Division of Reynolds Metals Company, and Horst W. Janecke, senior naval architect, and chief of hull design in New York for J.J. Henry Company, Inc., who designed and supervised the construction of the two midbodies which are the subject of the present case.

From the incorporated record and the evidence adduced in the present case, the following facts appear:

Reynolds Metals Company operates a fleet of bulk carriers and barges to move bauxite and alumina in the course of its business in various geographical locations throughout the United States and South America. Mr. Wood engaged the services of J.J. Henry Company, Inc., naval architects, to design a "jumboized"[3] tanker to be operated in Reynolds' business. He issued instructions and approved the drawings for the tankers to be constructed. Reynolds entered into a contract with the plaintiff corporation for the purchase of two jumboized tankers, as designed by J.J. Henry Company, Inc., and for the construction of the midbodies in a foreign yard for delivery to the United States for incorporation into the fore and aft sections of

---

[1] Petition for rehearing denied, October 6, 1966.

[2] As pointed out in *Bethlehem Steel*, 53 CCPA at 146, the duty-free status of vessels is not based upon any specific provision of the tariff act exempting vessels from duty nor making them entitled to free entry, but rather stems from the Supreme Court's decision in *The Conqueror*, 166 U.S. 110 (1897), which in effect held that it was not the intention of Congress to treat vessels as dutiable articles.

[3] In the incorporated case, plaintiffs' witness Frack described jumboizing as "a method for enlarging the size of the ship by replacing its cargo carrying section which is normally in the center of the vessel." The bow and stern of the old vessel are utilized in connection with a new and larger midsection (R. 14).

the two T-2 tankers.[4] After construction in Hamburg, Germany, the midbodies were towed across the Atlantic Ocean to the Todd shipyard in Hoboken, New Jersey.

In their condition on arrival in the United States, the midbodies were capable of being used as a barge in the transportation of cargo,[5] although they were neither designed nor constructed for use as a barge; and at the time of arrival, they had never actually been so used. The midbodies were designed and intended solely for use as the midsections of jumboized tankers.

As distinguished from the complete cargo vessels into which the midbodies were incorporated by plaintiff, the midbodies were 408 feet in length, 75 feet in beam (width), and 43 feet deep. They were equipped with ballast tanks and had five cargo holds for the stowage of cargo. These cargo holds were fitted with watertight hatch covers. All safety equipment was aboard, such as life-saving equipment, mooring equipment, railings, anchors, etc. Although it was subsequently to be removed, a bow was welded to the midbodies which was strong enough to protect the latter during the voyage across the ocean. Construction of the midbodies was approved by the American Bureau of Shipping, who had issued certificates for them to cross the Atlantic, but the midbodies were not certified by a regulatory body for use in this country. The present midbodies were constructed in substantially the same manner as those involved in the incorporated case, the record of which is summarized *infra*.

## SUMMARY OF ARGUMENTS

Plaintiff accepts the law relating to vessels as pronounced by the appellate court in *Bethlehem Steel*, but contends that the decision was predicated upon a factual finding that the midbodies were not barges,

---

[4] The following statement by plaintiff's counsel at the trial (R. 3–4) gives further background which is helpful in understanding the facts in this case, although, of course, we cannot regard such statement as evidence: "At the conclusion of the second World War there was a surplus of T-2 freighters and tankers, a type of freighter or tanker that had been built to serve during the wartime period, and which was found to be inefficient and uneconomical in the post-war commercial trade that followed; and there was devised a technique that was known as jumboizing these tankers. It involved removing this entire midsection that was the freight carrying part of the vessel, and that was generally about 300 feet long, and substituting in its place a new larger, stronger midsection, 450 to 550 feet in length, that was designed to carry a great deal more cargo, that was of a stronger construction and which when joined together with the fore and aft sections of the T-2 tanker, was a more desirable, more usable freight carrier.

"These two midbodies [involved in the instant case] were constructed in the shipyard of Germany at a time when such work could be done there and could not be done here, in a manner that would enable it to compete at all with the foreign shipyard construction.

"The midsections were completed, and were separately towed across the Atlantic to the Todd Shipyard Company in Hoboken. The old T-2 tanker was brought into drydock, the fore and aft sections were severed, and a great deal of work, labor and material was expended in joining the foreign-built fore and aft sections and in making power vessels."

[5] Although the maximum cargo capacity (based on weight) is not indicated in the record, the midbodies were capable of carrying at least 10,000 tons of cargo (R. 26, 33).

and thus not vessels. It is now emphasized that plaintiff has factually established through its two expert witnesses that the instant midbodies were actually barges upon their arrival in the United States, and that their *intended future use* as midsections of powered vessels is not a relevant consideration in determining whether they were vessels.

Defendant counters that *Bethlehem Steel* is *stare decisis*. Continuing, defendant asserts that the midbodies are no different from those in *Bethlehem*, which the appellate court found to be midsections and not barges.

## THE BETHLEHEM STEEL DECISION

Since the record in *Bethlehem Steel* is incorporated into the record of the present case, it is appropriate to set forth herein a brief summary of the pertinent evidence upon which our appellate court based its decision. In *Bethlehem*, we summarized the evidence as follows (54 Cust. Ct. at 3–4), which was adopted by the appellate court (53 CCPA at 143):

> It appears from the evidence that the midbodies in controversy were constructed in European shipyards in accordance with conventional designs, plans, and specifications prepared by naval architects which conformed to the accepted standards in the construction of watercraft generally and approved by governing bodies, such as the American Bureau of Shipping, the United States Coast Guard, and the United States Public Health Service.

> The midbodies were over 500 feet in length and had a cargo capacity of between 12,000 and 14,000 tons. In order to facilitate their transatlantic voyage, they were equipped with a temporary bow and additional stiffeners were used to strengthen the stern. Furthermore, each craft had sleeping accommodations for a crew of eight men, each of whom had signed ships' papers for the crossing. They were equipped with light, heat, power, food, radio facilities, and navigational lights and signals in order to comply with navigational rules of the road and to indicate that the craft were under tow, as required by law for vessels only. (33 U.S.C., sections 144(c)(i), 145(b), and 145c(a).)

> Upon arrival in this country, the midbodies were suitable for use as vessels of the barge type for commercial use in the transportation of cargo. They were designed for ultimate use as cargo sections of self-propelled ore carriers on the Great Lakes.

> The evidence also discloses that each craft carried marine insurance (plaintiffs' exhibit 7) which was secured for protection against damage or loss of the craft in transit and which also served as coverage for the crew of eight who manned the craft while crossing the ocean. In addition to the foregoing, the midbodies were equipped with liferafts, life preservers, anchor and chain, and a generator for light, heat, and messing.

After reviewing many judicial authorities dealing with the question of what constitutes a vessel, the trial court in *Bethlehem* concluded

that the midbodies were vessels, and accordingly not subject to the provisions of the Tariff Act of 1930. On appeal, the appellate court disagreed with that conclusion and reversed the decision and judgment below. The principles of law enunciated by the appellate court in its decision appear to be entirely applicable to the present case, and we are constrained to find that decision dispositive herein.

With respect to whether the midbodies in *Bethlehem Steel* were barges, the appellate court held (53 CCPA at 152):

> The midbodies, at the time of importation, were not "barges" or equivalent to a barge as appellees would have us hold. They were precisely what the evidence shows, a midsection for a vessel. They were complete in nearly every respect, as pointed out supra. In order to tow them across the ocean they were fitted with temporary, sturdy fore and aft sections.

After considering many of the same judicial authorities cited and discussed by this court involving so-called "inferior craft," viz., scows, dredges, barges, elevators, log rafts, etc., the appellate court further commented (*id.* at page 152–153):

> * * * in all the cases cited, each of the "inferior craft" was capable of and designed to perform a sufficiently related function to "means of transportation" on water to qualify as a vessel. The liberality expressed in the law in interpreting the term "vessel" goes to the very fact that size and structure per se does not determine that a structure is a vessel.
>
> \*    \*    \*    \*    \*    \*    \*
>
> All of the evidence of record establishes that the midsections, at the time of importation, were not watercraft designed or intended as a means of transportation on water. Their sole resemblance to craft that have been held to be vessels (barges) and their qualification under a liberal reading of the definitions advanced as vessels stems from the fact that temporary fore and aft sections were constructed for the tow across the ocean *to make possible their designed and intended use as midsections and not means of transportation.* * * * [Italics in original.]
>
> \*    \*    \*    \*    \*    \*    \*
>
> * * * the fact is that the midbodies made that trip [across the Atlantic ocean] for the exclusive purpose, and were designed and intended for no other reason than to serve as midsections of ore carriers. Thus considered, the midbodies were not vessels at the time of importation, consistent with the Supreme Court mandates we have to guide us in *The Conqueror* and *Norton* cases, supra.

It is thus clear that the appellate court ruled that the midbodies were not barges (or the equivalent of a barge) because "at the time of importation, [they] were not watercraft designed or intended as a means of transportation on water," but "were designed and intended for no other reason than to serve as midsections of ore carriers." Similarly, the present record conclusively establishes that the midbodies were not

designed and intended as a means of transportation on water in their condition upon arrival in the United States, but were designed and intended for no other reason than to serve as midsections of completed vessels, viz., jumboized T–2 tankers. The following testimony of Mr. Wood is particularly apposite in this respect (R.15) :

> Q. At the time of their arrival—and I should add, and in their condition on arrival in the United States—were these midbodies the midsections of powered vessels?—A. No, they were not. They were *brought here as midbodies*, to be incorporated into an aft and a fore section of a *vessel.* [Emphasis supplied.]

- and -

On cross-examination (R.19) :

> Q. Mr. Wood, were the midbodies in issue designed and intended *solely* for use for incorporation as the midsection of a tanker?—A. Yes. [Emphasis supplied.]

Also, as Mr. Janecke testified (R.38) :

> Q. You did design the midsection or the midbody at bar *solely* for use as a midsection of a bulk carrier?—A. Our contract called for designing a jumboized T–2 tanker. It means *building a midsection for this purpose.* [Emphasis supplied.]

The foregoing testimony of plaintiff's witnesses appears inconsistent with their statements that the midbodies were barges (R. 13, 34–35).[6] We are clear that the midbodies were neither designed to be, nor intended for use as barges; nor were they in fact brought to the United States in that capacity.

Additionally, in *Bethlehem Steel*, the appellate court pointed out that the sole resemblance of the midbodies to craft held to be vessels (barges) is based upon the "temporary fore and aft sections [which] were constructed for the tow across the ocean *to make possible their designed and intended use as midsections and not means of transportation.*" (53 CCPA at 152) [Italics in original.] Thus, the facts in the present case fall squarely within those of *Bethlehem*, as shown by the following testimony of Mr. Janecke (R. 37–38) :

> Q. Were you instructed by your client, in designing the midbodies at bar, to design a bow that would be readily removable?—A. * * * We were required to provide a bow which is strong enough to protect this so-called midbody *to make the voyage across the ocean.* [Emphasis supplied.]

---

[6] However, it appears from Mr. Wood's testimony on cross-examination (R. 25, 28) that the physical resemblance of the midbodies to barges operated by Reynolds was to the midsections of such barges, rather than to the complete barges.

We have also noted that in the incorporated record plaintiffs' witnesses Rosenblatt and Leaf testified that the midbodies were well adapted for use as barges, and Leaf stated that the barges to which he had referred were designed to be used as midbodies and were actually so used. That testimony was, of course, considered by the appellate court when it ruled that the midbodies were neither barges nor equivalent of barges (53 CCPA at 152).

Q. And that was the purpose of the bow you designed?—A. Since this midbody was *intended to serve as a midsection*, I believe we all understood it eventually would be burned off. [Emphasis supplied.]

In view of the foregoing, the fact that in the present case the bows were welded to the midbodies does not in our opinion change their temporary nature nor the status which the midbodies had in *Bethlehem*.

In short, plaintiff concedes that the holding in *Bethlehem Steel* is applicable in this case. It further appears that the controlling facts in the incorporated case are closely analogous to those herein. Hence, we agree with defendant's contention that *Bethlehem Steel* is *stare decisis*.

### THE NORTON CASE

Although we find that the midbodies herein are not barges, as contended by plaintiff, brief comment concerning *Norton* v. *Warner Co.*, 321 U.S. 565 (1944), is warranted. In *Norton*, the question arose as to whether a barge is a vessel. The Supreme Court held that a barge is a vessel within the meaning of 1 U.S.C. § 3, as it is "a means of transportation on water" (321 U.S. at 571). Based on *Norton*, plaintiff argues: "If that barge was a vessel, then clearly these midbodies, which transported their crews across the ocean, must have been vessels at the time of arrival." This very argument was made in *Bethlehem Steel* (53 CCPA at 149) and rejected by the appellate court. Plaintiff's argument has acquired no merit by the present record, since the fact still remains that the midbodies were designed and intended solely for incorporation into newly constructed jumboized tankers in Todd's shipyard. This is not, in our opinion, what Congress intended by the phrase in 1 U.S.C. § 3: "a means of transportation on water."

In conclusion, the question of whether the instant midbodies are "vessels," and thus outside the coverage of the tariff act, must be determined by the court. The opinion testimony of plaintiff's expert witnesses that the midbodies are "vessels" (R.11, 32, 33–34) is advisory only, and not binding upon the court. Within the criteria stated by our appellate court in *Bethlehem Steel*, we hold that the midbodies were not, in fact, barges at the time of their arrival in the United States; and therefore the plaintiff's claim that the midbodies are vessels is overruled. Judgment will be rendered accordingly.

FORD, Judge: I concur in the result.